UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| MICHELE REED MCCOY, | Case No. 8:19-CV-00575-AB (JEMx) |
|---|---|
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| AETNA LIFE INSURANCE COMPANY, *et al.*, | **TRIAL DATE: JUNE 30, 2020** |
| Defendants. | |

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, et seq. ("ERISA"). Plaintiff Michele Reed McCoy ("Plaintiff") alleges that Defendant Aetna Life Insurance Company ("Aetna") improperly denied her long term disability ("LTD") benefits and seeks an order requiring Aetna pay benefits.

The parties submitted opening and responsive trial briefs, along with an administrative record and supplemental evidentiary materials. The matter was tried before this Court, sitting without a jury, on June 30, 2020. Phil Bather of DarrasLaw appeared on behalf of Plaintiff. Daniel Ryan and James Castle of Hinshaw and Culbertson LLP appeared on behalf of Aetna.

The Court has heard the admissible evidence presented by the parties and the

arguments of counsel. Having considered the credibility of the witnesses and all papers and exhibits presented by the parties for purposes of this trial, including admissions in the Final Pretrial Conference Order, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

**FINDINGS OF FACT**

1. Plaintiff was employed as a Tax Manager at Andersen Worldwide SC from 1991 to 2000. (Complaint "Compl." ¶ 10, Dkt. No. 1; AR 1552, Dkt. No. 39). During her employment, Plaintiff was a participant in the Andersen Worldwide SC Long Term Disability Plan ("Plan"). (Compl. ¶¶ 3, 6).

2. The Plan is an employee welfare benefit plan that provides employees with income protection and continued life insurance coverage in the event of a disability. (Compl. ¶ 3).

3. The Plan defines "Total Disability/Totally Disabled" as:
> For Active Regular Employees with a job class code of manager and above, that solely because of an illness, pregnancy, or accidental bodily injury, an insured employee is unable to perform the material duties of the employee's own occupation.

(AR 2259, 2320).

4. Aetna, a Connecticut corporation authorized to transact the business of insurance in California, is the Plan's insurer and Claims Adjuster. (Compl. ¶ 4).

5. In May 2000, Plaintiff was diagnosed with ulcerated colitis and had a section of her large colon removed in August 2001. (AR 2179). That surgery resulted in symptoms that included fecal incontinence and diarrhea. (AR 2179).

6. Plaintiff filed a claim for LTD benefits with Aetna on August 31, 2000. (AR 1453, 1526).

7. Aetna determined that the severity of Plaintiff's gastrointestinal symptoms rendered her totally disabled, as defined in the Plan, from her occupation as

a Tax Manager and approved Plaintiff's LTD claim on September 13, 2000. (Compl. ¶¶ 11–13; AR 1483, 1492).

8. After approving Plaintiff's initial LTD claim, Aetna continued to provide Plaintiff LTD benefits for seventeen years and would periodically obtain attending physician statements ("APS") from Plaintiff's treating physicians and have Plaintiff complete questionnaires. (Compl. ¶ 25; AR 2179).

9. In April 2017, Aetna ran a search on Plaintiff and came across her Facebook page. (AR 2362). Plaintiff's Facebook posts documented Plaintiff engaged in various activities such as traveling, attending concerts and sporting events. (AR 1829–1947). Aetna determined that Plaintiff's involvement in these activities warranted further investigation because they were inconsistent with the medical reports on file. (AR 25–27, 2366–2367).

10. Aetna obtained APS from Plaintiff's treating family doctor, Dr. Connealy, on April 27, 2017, and asked Plaintiff to fill out a disability questionnaire, which she completed on April 28, 2017. (AR 1671, 1681–1683, 2355). Both of these documents reported that Plaintiff still suffered from fecal incontinence, chronic diarrhea, exhaustion, and a few other non-gastrointestinal conditions. (AR 1671, 1681–1683).

11. Aetna also referred Plaintiff's file to Claims Bureau USA Inc. ("Claims Bureau") to further investigate. (AR 2366). The Claims Bureau conducted a background investigation on Plaintiff and produced a report on May 5, 2017 that included a review of Plaintiff's Facebook posts from December 2012 to April 2017. (AR 1796, 1801–1810).

12. The background investigation also reportedly identified Plaintiff as the registered agent, CEO, and CFO of Reed2McCoy, Inc., an active California business established in 2013 associated with an eBay profile with over 3,421 feedback comments from buyers of items sold. (AR 1702, 1799, 1815–1817, 1948, 1953).

Plaintiff did not list this business on the "Other Income Questionnaire Disability Benefits" form she completed on April 28, 2017. (AR 1679).

13. In 2012, Plaintiff had an Inter-Stim sacral nerve stimulator ("neurostimulator") implanted, and it was replaced on June 13, 2017. (AR 462). The concurrent medical notes indicate that the neurostimulator controls fecal incontinence, and that since 2012, Plaintiff's symptoms had improved. (AR 1126, 1173–1175).

14. On July 7, 2017, after the neurostimulator replacement, Plaintiff had a follow-up appointment with her treating urogynecologist, Dr. Craig, whose post-operation notes stated that Plaintiff "feels bowels are back to normal" and "will have 1-2 fecal incontinence episodes a day which is less than baseline." (AR 25, 1126).

15. Aetna retained gastroenterologist, Dr. Jeffrey Jacobs as a peer reviewing physician ("Peer Reviewer") to review the updated medical information along with the rest of Plaintiff's seventeen-year claim file. (AR 562–570).

16. Dr. Jacobs's August 29, 2017 report stated the following:

> It appears that the claimant is suffering from chronic fecal incontinence after a subtotal colectomy for chronic constipation. She has had a neurostimulator implanted to control her fecal incontinence which seems to have reduced her stool frequency. This appears to be her main functional impairment. She should be able to continue with employment with adequate access to bathroom facilities . . . From my review of the records, it appears that the claimant should be able to perform sedentary work activity for eight hours a day, five days a week with adequate restroom breaks.

(AR 569).

17. On September 1, 2017, Aetna determined that Plaintiff no longer met the Plan's definition of disability and denied her LTD claim. (AR 219–224). Aetna's denial letter explained the basis for its determination and included a summary of all of the medical records reviewed, along with a summary of Dr. Jacob's report and his opinion that Plaintiff could perform generic sedentary work. (AR 219–224).

4

18. Aetna explained in the denial letter that a Vocational Consultant determined that Plaintiff's role as Tax Manager was best represented by the occupational title of Tax Accountant, as defined by the U.S. Department of Labor Dictionary of Occupational Titles ("DOT"). (AR 219). The letter also notes that the occupation of "Tax Accountant requires Sedentary-level physical demands." (AR 219).

19. On April 24, 2018, Plaintiff appealed the denial of her claim. (AR 436–442). In support of her appeal, Plaintiff submitted a list of job requirements for her occupation, which included the following:

- Review Tax Returns-Huge Deadline Driven client load
- Develop and Train Staff
- Recruiting On-Campus and In Office
- Client Meetings-In Office-Off-Site-In Their Office
- Business Development
- Client Proposals
- Client Billings-Deadline Driven
- Client Billing Collections
- Continuing Education -CPE Requirement Hours
- Peer Reviews-Other Offices
- Monthly Manager/Partner Meetings
- Review Work papers
- Research and Writing Memos for Clients
- Training-Teaching
- Training/Development
- Monthly Office Meeting
- Travel
- Client Lunches
- Mentoring/Counseling Staff

5

(AR 77–78).

20. Plaintiff also submitted reports and letters from some of her treating physicians in support of her appeal. (AR 436–442). These supplementary documents included letters from her audiologist, ophthalmologist, neurologist, and notes from a doctor who treated Plaintiff's shoulder. (AR 458–489). Although they indicated conditions Plaintiff had, none of these documents or physicians opined that those conditions precluded Plaintiff from doing work in her own occupation. (AR 458–489).

21. Plaintiff also submitted letters from her physician assistant and colon and rectal surgeon that stated that Plaintiff's condition, namely fecal incontinence and diarrhea, still precluded her from being in a typical work environment.[1] (AR 458–459, 462–464).

22. Aetna retained two other Peer Reviewers—gastroenterologist, Dr. Jeffrey Danzig and orthopedic surgeon Dr. Jules Davis Hip-Flores—to review Plaintiff's appeal. (AR 38–73).

23. In his July 13, 2018 report, Dr. Danzig stated that in his opinion, Plaintiff's treating providers' reports were inconsistent and the restrictions and limitations they provided were "not reasonable and appropriate." (AR 49). Dr. Danzig opined that Plaintiff had fecal incontinence and diarrhea, but her condition improved greatly and "would not prevent [Plaintiff] from sustaining activity, with the restrictions and limitations identified for an 8 hour day, 40 hours a week." (AR 48–50).

24. Dr. Hip-Flores also completed his peer review report on July 13, 2018. (AR 52–73). In his report, Dr. Hip-Flores opined that from his orthopedic perspective, Plaintiff had no functional impairment apart from the recovery periods after her surgeries. (AR 66–69).

---

[1] One of Aetna's Peer Reviewers, Dr. Danzig, attempted to contact Plaintiff's colon and rectal surgeon twice during his review, but was unsuccessful. (AR 47).

25. Taking these Peer Reviewers' reports and all the information Plaintiff and her treating physicians submitted into consideration, Aetna denied Plaintiff's appeal and upheld the termination of her LTD benefits on August 21, 2018. (AR 2216–2219).

26. Plaintiff subsequently brought this action against Aetna. (Dkt. No. 1).

27. At trial, Plaintiff was asked whether she would be able to work remotely, due to the current COVID-19 pandemic's effect on workplaces, Plaintiff maintained that the severity of her conditions precluded her from working remotely as well. (Trial Transcript ("Trial Tr.") 5:16–7:9).

## CONCLUSIONS OF LAW

### I. STANDARD OF REVIEW

28. The parties stipulated that the standard of review in this case is *de novo*. Under the *de novo* standard, the Court independently considers the evidence, finds facts, and determines how the policy applies, just as it would resolve any other breach of contract claim. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112–13 (1989); *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) ("'*de novo* review' . . . is an independent decision rather than 'review'. . . the court takes evidence (if there is a dispute about a material fact) and makes an independent decision.").

29. "In a trial on the record, the court can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Armani v. Nw. Mut. Life Ins. Co.*, 2014 WL 7792524, at *8 (C.D. Cal. Nov. 25, 2014), v*acated on other grounds*, 840 F.3d 1159, 1161 (9th Cir. 2016) (internal quotations omitted); *see also Schramm v. CNA Fin. Corp. Insured Grp. Benefits Program*, 718 F.Supp.2d 1151, 1162 (N.D. Cal. 2010) (a court reviewing the administrative record "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate").

30. The Court may consider the administrative record, which are the materials the administrator considered in reaching its benefit determination, and "new evidence may be considered under certain circumstances to enable the full exercise of informed and independent judgment." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943 (9th Cir. 1995).

31. Plaintiff bears the burden of proof of showing that she has a total disability under the Plan. *Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1100 (C.D. Cal. 2009), *aff'd*, 409 F. App'x 99 (9th Cir. 2010); *Estate of Barton v. ADT Sec. Servs. Pension Plan*, 820 F.3d 1060, 1065–66 (9th Cir. 2016) (Claimant bears the burden of proving entitlement to ERISA benefits "where the claimant has better—or at least equal—access to the evidence needed to prove entitlement.").

## II. DISCUSSION

32. Plaintiff alleges a plethora of medical conditions; however, the gravamen of Plaintiff's disability claim stems from her gastrointestinal issues, the severity of which served as the basis for her LTD claim's initial approval in 2000. (AR 219, Dkt. No. 39). At trial and in her briefing, Plaintiff argued that in addition to her gastrointestinal conditions, her orthopedic conditions also contribute to her disability. (Trial Tr. 26:3-16; Pl.'s Opening Trial Br. at 1, Dkt. No. 34). However, the documents she submitted from her treating orthopedic surgeons do not indicate that her orthopedic conditions preclude her from working. (AR 464–472). In fact, one of her treating orthopedic surgeon's notes even state that Plaintiff was doing well after her surgery, her discomfort was "mild," and she showed "good improvement" after therapy. (AR 480, 483). Thus, the Court accords little weight to Plaintiff's proposition that orthopedic issues are a major part of her disability claim.

33. It is undisputed that Plaintiff suffers from chronic diarrhea and fecal incontinence. (Pl.'s Responsive Trial Br. at 5, Dkt. No. 37; Def.'s Opening Trial Br. at

20, Dkt. No. 32). The parties dispute only the severity of Plaintiff's condition and whether it satisfies the definition of "total disability" under the Plan. (AR 219–224).

34. The extensive administrative record consists of over seventeen-years' worth of benefit payment logs, physician notes, laboratory test results, medication lists, physical exam results, and correspondences between Aetna and Plaintiff. (*See generally* AR). Notably, the administrative record also contains Plaintiff's Facebook posts that were obtained from a Claims Bureau background investigation. (AR 1687–1704). Aetna's initial denial of Plaintiff's LTD claim relied on this voluminous record and a Peer Reviewer's report, and for Plaintiff's appeal, Aetna relied on all of this in addition to supplemental documentation Plaintiff submitted, and two other Peer Reviewers' reports. (AR 219–224, 569, 2216).

35. In this action, Plaintiff argues that Aetna unreasonably denied her LTD benefits based on (1) non-examining Peer Reviewers' opinions; (2) an erroneous vocational analysis that did not account for her managerial role; and (3) her Facebook posts. (Pl.'s Opening Trial Br. at 2, Dkt. No. 34). The Court addresses each in turn.

**a. Peer Reviewers**

36. As a preliminary matter, Plaintiff criticizes Aetna's decision not to examine her. (Pl.'s Opening Trial Br. at 18). However, the Peer Reviewers reviewed the entirety of Plaintiff's case file that spanned over seventeen years and included pertinent medical records from her treating physicians, Aetna's correspondences with Plaintiff, investigative reports, and any additional information Plaintiff wanted to be considered on appeal. (Trial Tr. at 16:18–17:22; AR 38–52, 53–73, 562–570); *see also Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009) (When it is unclear if the Peer Reviewing physicians were presented with all of the relevant evidence, then pure paper reviews raise skepticism.). Thus, the Court does not find Aetna's decision not to examine Plaintiff to be unreasonable.

37. Plaintiff raises a couple other arguments to challenge Aetna's reliance on the Peer Reviewers' reports. First, Plaintiff argues that because there is conflicting

evidence between her treating physicians' opinions and Aetna's Peer Reviewers' opinions, the Court should give deference to her treating physicians. This argument is unavailing because it is well understood that ERISA does not require a plan administrator to accord greater weight to a claimant's treating physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) ("We hold that plan administrators are not obliged to accord special deference to the opinions of treating physicians.").

38. Second, Plaintiff contends that over the seventeen-year period she was paid LTD benefits, the same physicians treated her for the same conditions without substantial improvement. (Pl.'s Opening Trial Br. at 2, 20–21). However, "district courts within this circuit have consistently held that the burden of proof continues to lie with the plaintiff when disability benefits are terminated after an initial grant." *Muniz v. Amec. Constr. Mgmnt. Inc.*, 623 F.3d 1290, 1296–97 (9th Cir. 2010) ("[w]e are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind.").

39. Thus, Plaintiff bears the burden of showing her conditions have not improved and still satisfy the "total disability" definition under the Plan. The Court finds Plaintiff has not met this burden. Plaintiff argues that she has not had substantial improvement in her conditions—fecal incontinence and chronic diarrhea—but that is not supported by the objective medical evidence in her case file.

40. In the review of Plaintiff's claim file, the Peer Reviewers note several inconsistencies. For instance, upon appeal, Plaintiff submitted a letter from Plaintiff's treating physician assistant that implied worsening incontinence, but the notes from Plaintiff's treating urogynecologist indicated reasonable, but incomplete control of the incontinence. (AR 49).

41. In June 2017, Plaintiff's treating urogynecologist, Dr. Craig wrote in her pre-operative notes that Plaintiff "underwent a staged trial of sacral nerve stimulation in 2012 with greater than 50% improvement in her symptoms" and fecal incontinence.

(AR 1130–1132). Plaintiff and Dr. Craig assert that this was a mischaracterization on the part of Aetna's Peer Reviewer. (Pl.'s Responsive Trial Br. at 5, 15). However, this was not a statement that the Peer Reviewer heard and misstated, but rather it was a direct quote taken verbatim from Dr. Craig's own medical notes. (AR 205, 1126, 1130–1132).

42. The severity of diarrhea that Plaintiff alleges is also inconsistent with objective medical evidence in the record. Despite Plaintiff's assertions of severe diarrhea and malabsorption and an APS from Plaintiff's treating physician, which stated that Plaintiff's chronic diarrhea and fecal incontinence causes dehydration and malabsorption, no objective medical evidence supports this. (AR 221, 1681–1682). In fact, even Dr. Craig's notes indicate that Plaintiff is well-nourished, and do not mention malabsorption or dehydration, which are common, objective indicators of severe diarrhea. (AR 436–442, 1130–1132).

43. In the appeal process, Plaintiff's treating physicians received the Peer Reviewers' reports and conclusions and were invited to respond with the areas of the reports they agreed or disagreed with, and to include any clinical evidence or observations to support their opinions. (AR 37). In response to Aetna's request for treating physician input, Plaintiff's colon and rectal surgeon indicated that she had not noted any weight loss or electrolyte imbalance in Plaintiff. (AR 37).

44. These inconsistencies invite skepticism. Based on the record, it appears that the source of inconsistency in the claim file stems from the differences between Plaintiff's subjective complaints and the objective medical evidence. In situations like this, when there is contradictory evidence, Plan administrators can require objective evidence of an inability to function in the workplace. *Seleine,* 598 F. Supp. 2d at 1102 ("Treating physicians are more or less required to accept the representations of their patients, but . . . an ERISA administrator, is not obligated to do so.").

45. Here, the case file reflects that there was some improvement in Plaintiff's fecal incontinence and there is no support for malabsorption, dehydration,

1  weight loss or electrolyte imbalance that would expectedly result from diarrhea of the
2  severity Plaintiff alleges. (AR 49, 1126, 1130–1132). The Peer Reviewers' reports are
3  consistent with the objective medical evidence in Plaintiff's claim file that was
4  concurrently documented with her operations and procedures.
5    46.   The Court finds the three Peer Reviewers' reports to be persuasive and
6  reasonably relied on as they took into account Plaintiff's extensive claim file,
7  consulted with her treating physicians when possible, and reviewed the additional
8  documentation Plaintiff submitted in support of her appeal.

### b. Vocational Analysis

10    47.   Plaintiff challenges Aetna's 2017 vocational analysis and argues that it is
11 based on an erroneous DOT description that failed to account for the material
12 managerial duties of her occupation as a Tax Manager. (Pl.'s Opening Trial Br. at 8–
13 9).
14    48.   An insurer must conduct its vocational analysis "in a reasoned and
15 deliberative fashion." *Salz v. Std. Ins. Co.*, 380 Fed. Appx. 723, 724 (9th Cir. 2010).
16 When LTD benefits are conditioned on a claimant's inability to do her "usual" or
17 "regular" occupation, the insurer must analyze "what the claimant actually does before
18 it determines what the 'Material Duties' of a claimant's occupation are." *Ibid.* The
19 DOT has been "recognized as a widely used and reasonable reference for
20 administrators and courts to use under ERISA" in order to conduct a vocational
21 analysis. *Ramos v. United of Omaha Life Ins. Co.*, 2013 WL 4343413 at *5, 2013 U.S.
22 Dist. LEXIS 114373 at *15 (N.D. Cal. Aug. 13, 2013). However, federal courts have
23 routinely criticized the blind acceptance of the DOT's descriptions. *See Salz*, 380 Fed.
24 Appx. at 724 (insurer's "exclusive reliance" on the DOT was unreasonable); *but see*
25 *Gallagher v. Reliance Std. Life Ins. Co.*, 305 F.3d 264, 272–73 (4th Cir. 2002)
26 (reliance on DOT was reasonable when the DOT only omitted a minor occupational
27 duty).
28

49. Here, Aetna did not conduct a vocational analysis or request a job description from Plaintiff's employer when Plaintiff filed her initial LTD claim in 2000. (Pl.'s Opening Trial Br. at 3–4, 9; Dkt. No. 34). Although Plaintiff's employer no longer exists, the case file has a "Physical Demand Analysis" form her supervisor filled out in 2000. (AR 1513). Plaintiff argues that Aetna ignored this form and a list of occupational duties she provided upon appeal in its vocational analysis. (Pl.'s Opening Trial Br. at 17).

50. Because the DOT does not have an exact description to match Plaintiff's "Tax Manager" role, Aetna used the DOT's definition of "Tax Accountant" in its vocational analysis. (AR 2178–2179; Def.'s Responsive Trial Br. at 27). Aetna contends that it used the Physical Demand Analysis form and had a Vocational Consultant determine that Plaintiff's occupation was best represented by the occupational title of Tax Accountant, as defined by the DOT. (AR 2178–2179; Def.'s Responsive Trial Br. at 27).

51. Plaintiff contends that Aetna's reliance on the DOT's "Tax Accountant" description was erroneous because it does not account for her material managerial duties, which she insists are not sedentary. (Pl.'s Opening Trial Br. at 9; Pl.'s Responsive Trial Br. at 1). Aetna requested Plaintiff to provide the material duties of her occupation in the appeal, but the list she provided is inconsistent with her supervisor's Physical Demand Analysis form. (AR 77–78, 201; Pl.'s Opening Trial Br. at 17–18). The list of requirements that Plaintiff provided included off-site client meetings, on-campus recruiting, client lunches, and travel. (AR 77–78).

52. In her trial brief, Plaintiff asserts that her managerial duties "required being out of the office and traveling by car multiple days per week," but the Physical Demand Analysis form does not support this. (Pl.'s Responsive Trial Br. at 4; AR 1513). The Physical Demand Analysis form lists only a computer, operated 60% of the day, and phone, operated 40% of the day, as the required equipment for Plaintiff's occupation. (AR 77, 1513). Although there were additional spaces for the supervisor

to list other required equipment, and the form even suggested "car" and "other vehicle" as options, those were not listed as required for Plaintiff's occupation. (AR 1513). Given Plaintiff's emphasis on client engagement and travel, it is also noteworthy that the Physical Demand Analysis form allocated no percentage of her day toward off-site client engagements. (AR 77, 1513).

53. The Court is not persuaded that travel and off-site client engagement were as integral to Plaintiff's occupation as she alleges, especially since the Physical Demand Analysis form indicates that 0% of Plaintiff's day was spent outside. (AR 1513). The crux of Plaintiff's argument against the "Tax Accountant" description is that it failed to account for the material managerial duties, namely travel and client engagement.[2] For the reasons discussed above, this argument is unavailing, and the Court finds that Aetna conducted the vocational analysis in a reasoned and deliberative fashion.

### c. Facebook Posts

54. Plaintiff argues that Aetna unreasonably relied on her Facebook posts to deny her disability claim. (Pl.'s Opening Trial Br. at 7–8). Plaintiff contends that her Facebook posts documented "sporadic family activities" that are not indicative of her ability to work full time as a Tax Manager. (Pl.'s Opening Trial Br. at 7–8; Pl.'s Responsive Trial Br. at 11). Plaintiff asserts that unlike in a work environment, she has family members or friends who can assist her during these trips. (Pl.'s Opening Trial Br. at 7–8). When Aetna questioned Plaintiff about these travels and activities, Plaintiff explained that she takes Imodium, wears pads and diapers, knows where the

---

[2] Plaintiff also argues that under the Plan, employees are paid benefits if they are unable to perform material duties without accommodations and asserts that access to a restroom is an accommodation. (Pl.'s Responsive Trial Br. at 1). This argument is unavailing because reasonable access to a restroom would not alter the material duties of Plaintiff's occupation. *See Garrison v. Aetna Life Ins. Co.*, 558 F. Supp. 2d 995, 1005 (C.D. Cal. 2008) (When a Plan does not provide for accommodations, termination of LTD benefits that rely on accommodations that alter the material duties of an employee's occupation can be an abuse of discretion.).

14

restrooms are, and carries a second set of clothing. (AR 31; Pl.'s Opening Trial Br. at 7–8).

55. Despite this, Aetna argues that Plaintiff's Facebook posts document activities that are inconsistent with the restrictions and limitations Plaintiff alleges. (Def.'s Opening Trial Br. at 5–6). Plaintiff's overemphasis on travel as a material duty of her occupation gives credence to Aetna's position and consideration of the domestic and international travel activities Plaintiff posted on Facebook. (Pl.'s Responsive Trial Br. at 2–4). Nonetheless, Aetna admits that these posts alone are not a basis for finding that Plaintiff is not disabled and are not offered to suggest that Plaintiff does not have medical conditions. (Def.'s Opening Trial Br. at 2; Def.'s Responsive Trial Br. at 24). Rather, Aetna contends that these Facebook posts are presented to support objective medical evidence that demonstrates that Plaintiff's conditions are not as severe as she alleges. (Def.'s Opening Trial Br. at 2; Def.'s Responsive Trial Br. at 24).

56. To support her proposition that Aetna improperly relied on "sporadic" Facebook posts, Plaintiff cites inapposite cases. (Pl.'s Opening Trial Br. at 23). Those cases involved overreliance on surveillance conducted over just a few days, whereas here, Aetna's investigative reports included Facebook posts that spanned over multiple years, from 2012 to 2017. *Finley v. Hartford Life & Acc. Ins. Co.*, 400 F. App'x 198, 200 (9th Cir. 2010) (Where reviewing physicians were provided and instructed to review video footage that was not mischaracterized and upon which they did not rely on to the exclusion of all other evidence, demonstrated an appropriate effort to review all available evidence).

57. Further, Aetna's denial letters and administrative record demonstrate that Plaintiff's Facebook posts—though extensively reviewed and considered—were not the sole basis for Aetna's denial of Plaintiff's claim. (AR 219–224, 2216–2219). Accordingly, the Court finds Aetna's consideration of Plaintiff's Facebook posts, in

conjunction with the medical evidence and Peer Reviewers' reports on file, was reasonable.

58. Taking into consideration the administrative record, which includes the Peer Reviewers' reports, investigative reports, seventeen-year case file, Facebook posts, and additional materials Plaintiff submitted upon appeal, the Court finds that Plaintiff failed to establish that her condition at the time of review prevented her from performing the material duties of her occupation.

## III. CONCLUSION

59. For the foregoing reasons, the Court finds that under *de novo* review, Plaintiff has not established, by the preponderance of the evidence, that she is still "totally disabled" under the Plan. The Court therefore affirms the denial of Plaintiff's LTD benefits. Aetna shall submit a proposed judgment no later than fourteen (14) days of the issuance of this decision. Once the proposed judgment is submitted, Plaintiff shall have five (5) days to file her objections. Each side is to bear their own costs.

**IT IS SO ORDERED.**

Dated: October 28, 2020

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE